**In re NEW ENGLAND FISH COMPANY, a Maine Corporation, aka NEFCO, Debtor,**

**Sam RUBINSTEIN, Trustee in Bankruptcy for New England Fish Company, a Maine Corporation, aka NEFCO; and Ocean Beauty Alaska, Inc., an Alaska Corporation, Plaintiffs,**

v.

**ALASKA PACIFIC CONSORTIUM, et al., Defendants.**

**Bankruptcy No. 80–00864.
Adv. No. 80–0649.**

United States Bankruptcy Court,
W. D. Washington.

April 5, 1982.

Abraham A. Arditi, Seattle, Wash., for defendants.

Donald H. Pearlman, Keane, Harper, Pearlman and Copeland, Portland, Ore., for plaintiff.

Gordon Willhite, Sax & MacIver, Seattle, Wash., for Sam Rubinstein, trustee.

## MEMORANDUM OPINION

SIDNEY C. VOLINN, Bankruptcy Judge.

The plaintiffs, Ocean Beauty Alaska, Inc., (hereinafter "Ocean Beauty") and the trustee for the debtor, New England Fish Company (hereinafter "NEFCO"), have moved for summary judgment and for partial summary judgment authorizing sale of property free and clear of certain civil rights or Title VII claims being made against the NEFCO estate.

The essential issue in this case concerns whether Title VII successor liability applies to judicial sales in bankruptcy. The successorship doctrine was formulated by the courts to maintain the viability of a judgment affording relief resulting from employment discrimination, by requiring, where the business is transferred, that the successor owner be bound by the terms of the judgment. *See, Equal Employment Opportunity Commission v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086 (6th Cir.

1974). This principle holds that the new or successor employer is liable for the civil rights violations when there is substantial continuity in the business enterprise and substantial continuity in the identity of the work force. The doctrine was derived from labor relation cases. *John Wiley & Sons Inc. v. Livingston*, 376 U.S. 543, 551, 84 S.Ct. 909, 915, 11 L.Ed.2d 898 (1964); *Howard Johnson Company v. Detroit Local Joint Executive Board*, 417 U.S. 249, 263, 94 S.Ct. 2236, 2244, 41 L.Ed.2d 46 (1974). Claimants contend that they are entitled thereby to go to trial on the issues of identity and continuity.

### I.

The civil rights violations involved here were the basis of two class action suits brought by certain individual employees against their employers, NEFCO and Nefco-Fidalgo Packing Company (hereinafter "NFPC") for alleged violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq., (Title VII), and the Civil Rights Act of 1866, as amended, 42 U.S.C. §§ 1981 and 1988. The foregoing claims will be referred to collectively as the "civil rights claims". One case is *Domingo v. New England Fish Company*, Case No. 713–73C2 (W.D.Wa. filed 1973) (hereinafter the *"Domingo"* suit); the other case is *Carpenter v. Nefco-Fidalgo Packing Company*, Case No. C74–4074S (W.D.Wa. filed 1974) (hereinafter the *"Carpenter"* suit). The civil rights claims were based on racial discrimination in employment and the claimants seek injunctive relief, back pay, and a program to eradicate the effects of past discrimination. In the *Domingo* suit, the District Court found that NEFCO had discriminated on the basis of race in the allocation of jobs and in housing its employees. *Domingo v. New England Fish Company*, 445 F.Supp. 421 (W.D.Wa.1977).

### II.

The debtor was a major fish processing company with extensive facilities in Alaska. These operations, insofar as employment of labor is concerned, were of a seasonal nature. The employees, for the most part, worked intensively during a few months

each year processing seasonal runs of fish, particularly salmon. For various reasons, the debtor during its last year of operation, reached a point of management and financial crisis which caused a consortium of banks supplying financing to withhold their support. With their receivables pledged and no further financing available, NEFCO had no alternative but to cease operations.

On April 23, 1980, the debtor filed a petition for reorganization under Chapter 11 of the Bankruptcy Reform Act of 1978, 11 U.S.C. §§ 101 et seq. (hereinafter the "Code"), which was converted into a Chapter 7 liquidation proceeding on May 2, 1980.

The 1980 fishing season was rapidly approaching. Operation of the NEFCO facilities for the season was so important to the economy of the State of Alaska that its Governor, Jay Hammond, appeared to testify as to the urgency of a sale of the assets to a responsible party.

On June 16, 1980, the trustee for the NEFCO estate entered into an agreement with Ocean Beauty whereby Ocean Beauty, a subsidiary of Sealaska, an Alaskan native corporation, agreed to purchase certain assets of the estate (hereinafter the "Purchase Agreement"). The Purchase Agreement, as modified in February, 1981, obligated the trustee to sell these assets to Ocean Beauty, free and clear of various claims including those in *Domingo* and *Carpenter* for $15,156,371.

### III.

In July, 1980, attorneys for the claimants in the *Domingo* and *Carpenter* suits notified the trustee and Ocean Beauty Seafoods, Inc., a parent corporation of Ocean Beauty, that such claimants would attempt to hold Ocean Beauty Seafoods, Inc., liable for their claims under the successorship doctrine. In August, 1980, some of the. *Domingo* claimants objected to the sale of assets under the Purchase Agreement, free and clear of their civil rights claims. This Court, after notice to all creditors and parties in interest, and hearing, approved and authorized the Purchase Agreement by order entered on August 22, 1980.

The trustee and Ocean Beauty commenced this proceeding on September 22, 1980, to sell the assets of the NEFCO estate free and clear of the *Domingo* and *Carpenter* claims as well as other liens and interests. Among the prayers for relief, the plaintiffs request an adjudication that the assets of the NEFCO estate be transferred, free and clear of all liens and interests of all defendants, and a declaration that Ocean Beauty will not be deemed a successor employer of NEFCO or NFPC and will not be held liable for any relief obtained by the *Domingo* and *Carpenter* claimants against NEFCO or NFPC.

On October 21, 1980, certain individual claimants in the *Domingo* and *Carpenter* suits responded by filing an answer and counterclaims. Among the prayers for relief for such counterclaims, these claimants request that Ocean Beauty be held liable for the claims of the *Domingo* class under the successorship doctrine and for adequate protection of the interests of the *Domingo* class in the event the transfer of NEFCO estate assets to Ocean Beauty is consummated.

On March 3, 1981, this Court certified the *Domingo* and *Carpenter* claimants as classes for the purpose of determining the issue of successorship liability. The plaintiffs moved for summary judgment and for partial summary judgment against the *Domingo* and *Carpenter* classes on March 13, 1981. Specifically, the plaintiffs seek, as a matter of law: a decree that the sale of the NEFCO estate assets be free and clear of the liens and interests of the *Domingo* and *Carpenter* classes; that determination be made on attachment of interests and liens to proceeds of the sale; that an injunction be issued to prevent enforcement of liens or interests on NEFCO estate assets sold to Ocean Beauty; that this Court retain jurisdiction for any litigation asserted by the *Domingo* and *Carpenter* claimants relating to such sale; an adjudication and decree that Ocean Beauty is not a successor employer of NEFCO or NFPC for purposes of the civil rights claims of the *Domingo* or *Carpenter* classes; a judgment dismissing

with prejudice the counterclaims of the *Domingo* and *Carpenter* classes that Ocean Beauty is liable to them as a successor employer and that if the transfer of NEFCO estate assets is consummated, the *Domingo* and *Carpenter* classes are entitled to adequate protection under 11 U.S.C. §§ 361 and 363; and a judgment against the *Domingo* and *Carpenter* classes for plaintiff's costs and disbursements.

### IV.

The United States District Court for the Western District of Washington, on November 18, 1981, awarded the *Domingo* class certain monetary amounts for job discrimination, housing discrimination, and attorneys fees. All other claims in the *Domingo* suit were expressly denied. *Domingo v. New England Fish Company*, Case No. 713–73C2 (W.D.Wa. November 18, 1981). This award has been appealed and cross-appealed to the Ninth Circuit in Case Nos. 81–3702, 82–3207, 82–3026, and 82–8035. There has been no determination of liability or relief in the *Carpenter* suit.

### V.

The Bankruptcy Code provides that the trustee in a Chapter 7 proceeding takes title to all property of the debtor, 11 U.S.C. § 541. Whenever possible the property is liquidated and the proceeds distributed to various claimants of the debtor. The distribution is made pursuant to designated priorities, 11 U.S.C. § 507. Based on this statutory scheme, the Supreme Court of the United States has held that if one claimant of the bankrupt's estate is to be preferred over others, "the purpose should be clear from the statute." *Nathanson v. National Labor Relations Board*, 344 U.S. 25, 29, 73 S.Ct. 80, 83, 97 L.Ed. 23 (1952).

The *Domingo* claimants do not have a judgment lien resulting from the November 21, 1977, finding of discrimination by the District Court. Such judgments are interlocutory where the assessment or awarding of other relief remains to be determined. *Liberty Mutual Insurance Company v. Wetzel*, 424 U.S. 737, 744, 96 S.Ct. 1202, 1206, 47

L.Ed.2d 435 (1976). The final judgment granting monetary awards to the *Domingo* claimants was entered after bankruptcy proceedings were commenced by NEFCO. These claimants, by virtue of the post-bankruptcy judgment, became unsecured general creditors with liquidated claims. The *Carpenter* claimants, if they can prove liability and obtain an order for relief, will also be unsecured general creditors of the NEFCO estate.

While the *Domingo* and *Carpenter* classes contend that the assets of the NEFCO estate should not be sold free and clear of their interests in such property based on the civil rights claims, 11 U.S.C. § 363(f) allows the trustee to sell property "free and clear of any *interest in such property* of an entity other than the estate, only if—..." (Emphasis added). As discussed above, the *Domingo* claimants are general unsecured creditors of the NEFCO estate. The *Carpenter* claimants may become general unsecured creditors of the estate. They also do not have an interest in the specific property of the estate being sold to Ocean Beauty which is contemplated by 11 U.S.C. § 363(f).

The *Domingo* and *Carpenter* claimants rely heavily on the majority decision of the National Labor Relations Board in *International Technical Product*, 249 NLRB No. 183, 104 LRRM 1294 (1980). In that case, the Board majority held that sale of a bankrupt's property, free and clear of liens, did not extinguish successorship liability for back pay for unfair labor practices in violation of the National Labor Relations Act. The reasoning of the majority is considerably attenuated by the dissent which expresses concern at circumventing the specific distribution scheme of the Bankruptcy Code:

"My colleagues state that a Board backpay order differs from a lien or encumbrance and therefore cannot be extinguished or modified by a bankruptcy court. However, this assertion ignores the clear instruction, given us by the Supreme Court in *Nathanson*, that, in enforcing its backpay award against a

bankrupt, the Board sits in the same position as any other unsecured claimant. In *Nathanson*, the Court held, contrary to the Board's assertion, that Board backpay awards are not entitled to priority under the Bankruptcy Act as a debt due the United States. The Court stated therein:

'The Board argues that the interest of the United States in eradicating unfair labor practices is so great that the back pay order should be given the additional sanction of priority in payment. Whether that should be done is a legislative decision. The contest now is no longer between employees and management but between various classes of creditors. The policy of the National Labor Relations Act is fully served by recognizing the claim for back pay as one to be paid from the estate. The question whether it should be paid in preference to other creditors is a question to be answered from the Bankruptcy Act.... The theme of the Bankruptcy Act is "equality of distribution" (*Sampsell v. Imperial Paper Corp.*, 313 U.S. 215, 219, 61 S.Ct. 904, 907, 85 L.Ed. 1293); and if one claimant is to be preferred over others, the purpose should be clear from the statute. We can find in the Bankruptcy Act no warrant for giving these back pay awards any different treatment than any other wage claims enjoy.' "

The majority, in a footnote, discusses the dissent's treatment of *Nathanson*. Our conclusion is that the effort to distinguish *Nathanson* is based on specious reasoning.

The *Domingo* and *Carpenter* claimants also cite *Howard v. Penn Central Transportation Company*, 87 F.R.D. 342 (N.E.Ohio 1980) in support of their position. *Howard* discussed the applicability of the successorship doctrine under the Regional Rail Reorganization Act, a type of reorganization under a different statute than the case at bar. The *Howard* court held that successorship liability was inconsistent with the intent of the Regional Rail Reorganization Act insofar as monetary liability is concerned and denied the civil rights claimant's

monetary claim against the purchaser of the railroad. The court held, however, that certain non-monetary relief was within the intent of the Act and granted relief which was based on what was conceived to be a statutory requirement. In any event, there was a question as to whether the identity of the successor was sufficiently detached from the predecessor entity.

The *Domingo* and *Carpenter* claimants also cite *Bellingham Frozen Foods, Inc. v. National Labor Relations Board*, 626 F.2d 674 (9th Cir. 1980) for the proposition that the Ninth Circuit recognizes the successorship doctrine in situations involving the Code. *Bellingham* was not faced with the same considerations facing the parties here. That decision involved collective bargaining considerations under the National Labor Relations Act, as they applied to a prior purchase from the bankrupt. The estate was not involved, the contest having been between the successor and the NLRB. The issue of sale free and clear of liens or claims relating to property of the estate, or the problems of priority was not before the court. A careful reading of the case, moreover, demonstrates that the successor itself was involved in violations of the collective bargaining provisions of the NLRA, a factor which is not present here. In summary, the issue which is paramount here was, at best, remotely or tangentially involved in *Bellingham*.

Another case which, like *Bellingham*, is related to this subject is *Forde v. Kee-Lox Mfg. Co. Inc.*, 584 F.2d 4 (2d Cir. 1978). That case affirmed the District Court's decision in 437 F.Supp. 631 (W.D.N.Y.1977). The lower court held that a bankruptcy sale could be made free and clear of Title VII successorship claims as a matter of law. On appeal the trial court was affirmed on the grounds that the record showed there was no continuity of employment. The holding reserved ruling on the legal issue concluding that, on the facts, this issue need not be reached.

At this point, it should be noted that no case cited, other than *International*, the NLRB case, *supra*, has considered the man-

date of the Supreme Court in *Nathanson v. NLRB, supra,* that where claims result from non-bankruptcy litigation or administrative proceedings, and the debtor becomes involved in bankruptcy, the only framework for priorities among claimants is that of the bankruptcy statute.

There is an analogous line of bankruptcy cases which deal with collective bargaining agreements. Recently, the United States Court of Appeals for the Ninth Circuit, in *Local Joint Executive Board, AFL–CIO v. Hotel Circle, Inc.,* 613 F.2d 210 (9th Cir. 1980), authorized rejection, in bankruptcy, of a collective bargaining agreement by the debtor-in-possession where a purchase of the business from the estate was conditioned on the purchaser taking free and clear of any existing collective bargaining agreement. The successorship doctrine was implicitly held inapplicable to § 313 of the Bankruptcy Act, 11 U.S.C. § 713(1), which allows rejection of executory contracts of the debtor. The Court of Appeals stated:

> Similarly, we conclude that the unique features of labor agreements do not overcome the plain language of the Bankruptcy Act and the policies embodied in Chapter XI proceedings. While we recognize that important employee interests are at stake when rejection of a labor agreement is considered, the policies of the Bankruptcy Act are designed to assist failing businesses, a goal in which employees ultimately have a stake as well. We do not believe that the power to reject labor agreements found to be onerous and burdensome to the debtor's estate is inconsistent with the policies of the labor laws. 613 F.2d at 214.

## VI.

The case which develops the successorship concept in the Title VII area is *EEOC v. MacMillan Bloedel, supra.* *MacMillan* extended certain United States Supreme Court cases dealing with collective bargaining issues, for example, *John Wiley & Sons Inc. v. Livingston, supra.* *Wiley* dealt with a merger between certain corporate entities. The court held that the collective bargaining agreement survived the merger. Those cases and *MacMillan* did not involve a judicial sale in bankruptcy. A number of the considerations presented in *MacMillan* and cases of a similar nature, are not applicable in bankruptcy. These cases encompass voluntary or negotiated transfers and do not involve resolution of issues brought on by competing claimant groups. Assuming such a resolution was necessary, in view of the priorities articulated by Congress in the Bankruptcy Code, there should be a clear indication or mandate that these priorities should defer to the civil rights claimants. The legislative history cited by *MacMillan, supra,* at 1091, provides, as a statutory mandate, only a basis for rationalization at best.

The *Domingo* and *Carpenter* classes contend that "courts are not at liberty to pick and choose among Congressional enactments, and when two statutes are capable of co-existence it is the duty of the courts, absent a clearly expressed Congressional intent to the contrary, to regard each as effective." *Morton v. Mancuri,* 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974). As previously stated, the successor doctrine is not a Congressional enactment, nor does the legislative history to any statute state or, in our view, suggest such a doctrine.

To hold as contended for by claimants would effectively implement a value judgment, or interpretation, that it was the intention of Congress for certain creditor or claimant constituencies to be accorded a higher priority than any set forth in the Code; indeed, that the particular wage claimants in the claimant classes are to be accorded a higher priority than wage claimants generally who are provided for by 11 U.S.C. § 507(a)(3). Such a result would be contrary to *Nathanson v. NLRB, supra.*

## CONCLUSION

The trustee is the successor to the debtor-in-possession. He concluded that the operation of the business was not practical. He sold it to Ocean Beauty. The latter would not and will not take the business burdened

with civil rights litigation. No purchaser would. Such a prospect would chill or render impossible any sale. Those who would suffer from the uncertainty and delay would be creditors, including the *Domingo* and *Carpenter* claimants themselves. These impediments are far out-weighed by a policy encouraging bankruptcy sales subject only to claims of a specific and recognized nature in the subject property.

The apprehension that bankruptcy will become a convenient expedient for avoiding the successorship doctrine is not well founded. The adverse consequences of bankruptcies involving displacement of management, creditor control and liquidation hardly support the argument that employers will use bankruptcy to avoid their responsibilities under the civil rights acts. *Forde v. Kee-Lox Manufacturing Company, supra.* See also *Shopmen's Local Union No. 455 v. Kevin Steel Products, Inc.*, 519 F.2d 698 (2d Cir. 1975).

Congress has stated relative priorities for various elements of the debtor's creditor constituency in the Code. It is contended there are now two court-created exceptions: NLRA and Title VII claimants. Assuming this is so, if both were present, which of these would be prior to the other? Where is this to end? It is only a question of time before such a priority could and would be extended to other aggregations of claimants. To allow exceptions to be created by extrapolation from one case to another would eventually subvert the specific priorities which define Congressional policy for bankruptcy distribution to creditors.

We conclude that the assets of the NEFCO estate being transferred pursuant to the Purchase Agreement may be transferred free and clear of the claims of the *Domingo* and *Carpenter* classes; that Ocean Beauty is not a successsor employer of NEFCO or NFPC for purposes of the sale of assets of the NEFCO estate, and that the *Domingo* and *Carpenter* classes have no interest in assets of the estate. The parties shall pay for their own costs and disbursements.

The parties may present proposed order or judgment consistent herewith on due notice.